RECV'D

UNITED STATES BANKRUPTCY COURT
DISTRICT OF RHODE ISLAND

```
************************************
                                   *
In re:                             *
                                   *   Chapter 11
NEWPORT OFFSHORE LTD.,             *   Case No. 85-00723
                                   *
      Debtor                       *
************************************
```

## ORDER

For the reasons set forth in this court's memorandum of decision dated this date, it is hereby ORDERED that the disbursing agent's motion seeking authority to release unclaimed funds is GRANTED. The United States' Trustee's objection thereto is OVERRULLED.

DATED: February 9, 1998

James B. Haines, Jr.
U.S. Bankruptcy Judge*

*For the District of Maine, sitting by designation.

Entered on docket
Date  3/11/98

UNITED STATES BANKRUPTCY COURT
DISTRICT OF RHODE ISLAND

```
********************************
                              *
In re:                        *
                              *   Chapter 11
NEWPORT OFFSHORE LTD.,        *   Case No. 85-00723
                              *
     Debtor                   *
********************************
```

## Memorandum of Decision

Submitted on a stipulated record is the U.S. Trustee's objection to the plan disbursing agent's motion seeking authority to release unclaimed funds to co-receivers of the reorganized debtor. The objection raises questions concerning the permissibility of Rhode Island's statutory scheme providing for receivership, involuntary liquidation, and dissolution of state-created corporations in light of the asserted preemptive effect of the Bankruptcy Code.[1]

For the reasons set forth below, I conclude that the Rhode Island receivership laws are not preempted as the U.S. Trustee asserts.

## Background

---

[1]     The facts are undisputed. This memorandum sets forth my conclusions of law in accordance with Fed. R. Bankr. P. 752 and Fed. R. Civ. P. 52.

References to the "Bankruptcy Code" or the "Code" are to the Bankruptcy Reform Act of 1978, as amended, 11 U.S. C. § 101, et seq.

## 1.  The Newport Offshore Bankruptcy and Plan.

Newport Offshore filed a voluntary Chapter 11 petition on November 13, 1985. Its plan of reorganization, under which 85% of its stock was sold to Allied Marine, Inc., was confirmed on April 3, 1987. Matthew J. McGowan, Esq., was appointed disbursing agent. Utilizing funds obtained from, *inter alia*, the proceeds of the stock sale, McGowan made dividend distributions to Newport Offshore's unsecured creditors. Out of McGowan's final distribution, $30,927.84 was returned to him as undeliverable. Checks amounting to an additional $15,827.96 were never cashed.

After making all reasonable efforts to effect the distributions called for by the plan, McGowan moved for authority to remit the unclaimed funds[2] he holds to the "debtor," pursuant to 11 U.S.C. § 347(b).[3] Although such a motion would be unlikely to create controversy in the usual circumstance, post-confirmation developments have taken this case out of the mill run, making the task of returning funds to the "debtor" highly controversial.

## 2.  Non-Bankruptcy Developments.

---

[2]    First reciting the sums representing uncashed and returned checks (which add up to $46,755.58), the disbursing agent's motion refers to the "approximately $46,800.00" that he holds. The difference is immaterial to resolution of the issues before me.

[3]    In pertinent part section 347(b) provides: "Any security, money, or other property remaining unclaimed . . . under any plan confirmed under section . . . 1129 . . . becomes the property of the debtor or of the entity acquiring the assets of the debtor under the plan, as the case may be."  § 347(b).

On September 18, 1990, the reorganized Newport Offshore (substantially owned by Allied Marine) was placed under state court receivership at the behest of Benedetto A. Cerilli, a post-confirmation creditor. The Rhode Island court appointed Allan M. Shine and Milton Stanzler as Newport Offshore's temporary and, later, permanent co-receivers. As required by the order appointing them, the co-receivers published receivership notices in the Providence Journal and mailed such notices to each of Newport Offshore's known creditors.

On October 24, 1990, the state court appointed Messrs. Shine and Stanzler to be Allied Marine's temporary and, later, permanent co-receivers. Again the receivers published appropriate notices and served them by mail on the entity's known creditors.

In the interim, on October 19, 1990, the state court authorized the co-receivers to sell substantially all of Newport Offshore's operating assets to P.C. & J. Contracting Co., Inc., free and clear of liens. Subsequently, American Shipyard, Inc., succeeded to P.C. & J.'s interests.

**3. Back to Bankruptcy.**

    **a. American Shipyard's Bankruptcy.**

The circle of insolvency was completed when American Shipyard filed its own Chapter 11 petition on May 31, 1996. Its reorganization efforts are ongoing.

    **b. Newport Offshore's Plan: Final Throes.**

3

The foregoing developments have rendered the disbursing agent's proposal to return unclaimed funds to the debtor something other than a straightforward exercise. McGowan proposed that the remaining undistributed funds be turned over to Shine and Stanzler who succeeded to Newport Offshore's interests when they became its co-receivers. His motion drew the U. S. Trustee's immediate objection, asserting that Newport Offshore's receivership proceedings amounted to a state law procedure "tantamount to bankruptcy" and, therefore, that the receivership was a "nullity" as a consequence of the Bankruptcy Code's preemptive power.

As the U.S. Trustee's argument goes, Newport Offshore's unclaimed funds may not go to the co-receivers, but, rather, must be paid into court and, presumably, eventually escheat to the federal government.  See  28 U.S.C. § 2042 (directing that unclaimed money deposited with the court for at least five years be deposited with the U.S. Treasury under title of the United States); 11 U.S.C. § 347(a)(directing that all remaining property of the estate be paid to the court, pursuant to title 28, sections 2041 and 2042, ninety days after final distribution in a bankruptcy case).

Although the issues were joined some time ago, months passed while numerous amici curiae weighed in, while the original bankruptcy judge recused himself, and while the parties assembled and filed a comprehensive stipulated record at the court's

4

insistence.[4]  In the interim, a partial compromise was achieved: the parties agreed that the disbursing agent may distribute $35,000.00 to American Shipyard's Chapter 11 trustee, to be used in aid of its reorganization.[5]  Disposition of the balance of funds (over $10,000 plus accruing interest) remains disputed.

### Discussion

My analysis proceeds in stages.  First, I shall address this court's jurisdiction to hear and decide this controversy.  Next I shall briefly describe corporate receiverships under state law, proceeding to a treatment of Rhode Island's corporate receivership statutes and procedures.  I shall then turn to general preemption principles, followed by examination of how those principles operate in the bankruptcy arena.  Finally, I shall apply pertinent principles to determine whether the Rhode Island corporate receivership laws pursuant to which Newport Offshore was placed

---

[4]   In the course of events, pursuant to 28 U.S.C. § 2403, Fed. R. Bankr. P. 7024(c), and Fed. R. Civ. P. 24(c), Rhode Island's Attorney General was notified of this controversy and participated in the briefing.

[5]   The compromise was approved within each of the two affected bankruptcy cases (Newport Offshore and American Shipyard), as well as by the state court presiding over the Newport Offshore's receivership.

The compromise recognizes de gratia a chain of ownership of Newport Offshore's assets, running from the reorganized corporation to the co-receivers, to P.C. & J., to American Shipyard and, eventually, to American Shipyard's estate.  It reserves the U.S. Trustee's right to challenge the validity of that chain de jure by litigating its objection to the disbursing agent's motion to the extent of the remaining funds.

under the control of its co-receivers are preempted by the Bankruptcy Code.

## 1. Jurisdiction.

This court has jurisdiction over the pending controversy pursuant to 28 U.S.C. § 157 and 28 U.S.C. § 1334. See Gray v. Polar Molecular Corp. (In re Polar Molecular Corp.), 195 B.R. 548, 552 (Bankr. D. Mass. 1996) (describing the interaction of sections 157 and 1334 in the context of a challenge to a bankruptcy court's jurisdiction over a trustee's post-confirmation complaint to recover estate funds).[6]

This dispute fits comfortably within the tightened girth of this court's post-confirmation, post-substantial consummation,[7] but

---

[6] Distribution of the unclaimed Newport Offshore funds might reasonably be characterized as a core matter because it is among "other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship." § 157 (b)(2)(O). However, characterization of this proceeding as "core" or "noncore" is unimportant on the record before me.

[7] Determining the proper recipient of the unclaimed funds is going forward after "substantial consummation" of Newport Offshore's plan, a point where the court's post-confirmation jurisdiction is narrowed considerably. See § 11 U.S.C. 1101(2) (defining "substantial consummation" as the "transfer of all or substantially all of the property proposed by the plan to be transferred," the debtor's/successors's assumption of the business or management of substantially all of the plan property, and "commencement of distribution under the plan"); In re DN Associates, 165 B.R. 344, 347 (Bankr. D.Me. 1994)(explaining how jurisdiction diminishes upon substantial consummation of the plan).

The "substantial consummation" inquiry, as it relates to jurisdiction, holds a somewhat chimerical importance. Rather

pre-final decree, jurisdiction.   While jurisdiction over disputes

within a bankruptcy case constricts after confirmation, see In re

DN Associates, 165 B.R. at 347; but see In re Almac's, Inc.,202

---

than establishing a jurisdictional dividing line, it serves as
short-hand for the pragmatic reality that the bankruptcy court
releases jurisdiction over matters in the case as they are put to
rest as plan execution progresses.  It retains jurisdiction over
a few matters, such as the one before me, that await resolution
before the final decree can issue. See In re Polar Molecular
Corp., 195 B.R. at 554-56 (post-substantial consummation posture
was "not dispositive of the question of jurisdiction," observing
that, while "substantial consummation and a reduction of
jurisdiction are concomitant, substantial consummation alone does
not divest [the bankruptcy court] of jurisdiction");  In re DN
Associates, 165 B.R. at 347 (plan was substantially consummated
shortly after confirmation, but jurisdiction over fee application
of debtor's attorney endured);  see also Zahn v. Yucaipa Capital
Fund (In re Almac's, Inc.), 202 B.R. 648,655 (D.R.I. 1996)
(identifying substantial consummation as "merely one step along
the path toward consummation," emphasizing that the attrition in
matters over which the court has jurisdiction does not strip the
court of jurisdiction over the unperformed elements of the plan).

     The constriction of jurisdiction upon substantial
consummation is tethered to an aversion towards unnecessarily
maintaining the reorganized debtor's "tutelage status."  Beal
Bank, S.S.B. v. Jack's Marine, Inc., 201 B.R. 376, 379 (E.D.Pa.
1996). See also North Am. Car Corp. v. Peerles Weighing & Vending
Mach. Corp., 143 F.2d 938, 940 (2d Cir. 1944)(deploring a
district court's indefinite tutelage over reorganized debtors not
necessary "to protect its original confirmation decree, prevent
interferences with the execution of the plan, and otherwise aid
in its operation");  In re Polar Molecular Corp., 195 B.R. at 553
(surveying cases taking both narrow and wide views of the
propriety of post-confirmation jurisdiction);  In re DN
Associates, 165 B.R. at 348 n.12 (discussing cases finding
unwarranted "tutelage,"  detecting none in determination of post-
confirmation fee dispute).

     Determining the disposition of unclaimed funds hardly
qualifies as perpetuating Newport Offshore's indefinite tutelage.
Indeed, with this step accomplished, the case will likely close
finally forthwith.

B.R. at 655(adopting a view that the scope of jurisdiction analysis is unchanged after confirmation, noting "markedly different conclusion concerning the scope of pos-confirmation jurisdiction"), both stirrups of post-confirmation jurisdiction are present here.

First, this court has statutory jurisdiction over the unclaimed funds pursuant to §§ 1142 and 347 of the Bankruptcy Code. See 11 U.S.C. § 1142 (implementation of the plan); § 11 U.S.C. 347 (unclaimed property); cf. In re DN Associates, 165 B.R. at 347 (basing post-confirmation jurisdiction over attorney fee applications on Code provisions addressing fees); generally 4 William L. Norton, Norton Bankruptcy Law and Practice § 95:6 (2d. 1993)[hereinafter Norton](noting that a party's invocation of the bankruptcy court's post-confirmation remedial powers in the Code "activates" title 28 jurisdiction). The pending dispute implicates Code provisions that contemplate post-confirmation activity, see 4 Norton, supra, at § 95:7, and this court exercises its § 1142(b) jurisdiction accordingly. See In re Polar Molecular Corp., 195 B.R. at 552-53 (finding bankruptcy court jurisdiction over a post-confirmation recovery action by trustee pursuant to 11 U.S.C. § 1142 and 28 U.S.C. § 1334).

Second, the plan and its confirmation order provide for continuing jurisdiction over administration of the assets of the estate. Article VII of the plan provides for ongoing jurisdiction over the ownership and disposition of property under the plan until

8

distributions are complete.[8]   The confirmation order contains

---

[8]     Article VII of the Plan reads:

The Court shall retain jurisdiction over the
proceedings pursuant to the provisions of the Bankruptcy
Code until the final allowance and payment or disallowance
of all claims affected by the Plan and the disposition of
all property of the estate and with respect to the following
matters:

A.   To enforce any order previously entered herein;
B.   To interpret or construe the Plan or any order
     previously entered herein;
C.   To insure that the purpose and intent of the Plan
     is effectuated;
D.   To herein determine all claims against the Debtor
     or against property of the estate which are not
     adjudicated or settled prior to confirmation and
     to determine participation, if any, under the
     Plan;
E.   To hear, determine and enforce any and all causes
     of action, including action to recover on the
     government claims defined in Article I.G.
     hereof(emphasis omitted), which the Debtor has
     brought or may bring, to set aside liens or
     encumbrances, to recover any preferences,
     transfers, receivables or other assets or damages
     to which the estate may be entitled and to
     subordinate or disallow in whole or in part any
     claim herein under applicable provisions of the
     Code and other federal, state or local laws;
F.   To hear and determine any and all claims arising
     from the assumption or rejection of executory
     contracts and to consummate such assumption or
     rejection;
G.   To adjudicate all controversies concerning the
     classification of any claim or interest;
H.   To liquidate damages in connection with any
     disputed, contingent or unliquidated claim
I.   To adjudicate all claims of a security or
     ownership interest in any property of the estate
     or in any proceeds hereof;
J.   To adjudicate any claim or controversy arising out
     of the purchase, sale or contract made or
     undertaken by the Debtor during the proceedings;
K.   To recover all assets of the Debtor and all
     property of the estate wherever located;

9

complementary provisions.[9]

---

    L.   For any other purpose specifically set forth in the Order on Confirmation of the Plan; and

    M.   To make such other orders as are necessary or appropriate to effectuate the provisions of the Plan.

[9]   The confirmation order provides for retained jurisdiction as follows:

Pursuant to ARTICLE VII of the Plan, this Court hereby retains jurisdiction of these proceedings pursuant to and for the purposes of Code Sections 105(a) and 1127 and for such purposes as may be necessary or useful to aid the confirmation and implementation of the Plan, including for the following purposes:

    A.   To enforce this Order and any Orders previously enters herein;

    B.   To interpret or construe the Plan or any Order previously entered into;

    C.   To insure that the purpose and intent of the Plan is effectuated;

    D.   To herein determine all claims against the Debtor or against property of the estate which are not adjudicated or settled prior to confirmation;

    E.   To hear, determine and enforce any and all causes of action, including actions to recover on the government claims defined in Article I.C. of the Plan, which the Debtor has brought or reorganized Debtor may bring, and any action by the "Jewett Group", George F. Jewett and the unsecured creditors to enforce the security interests granted to them through the Plan, and actions to set aside liens or encumbrance, to recover any preferences, transfers, receivables or other assets or damages to which the estate may be entitled and to subordinate or disallow in whole or in part any claim herein under applicable provisions of the Code and other federal, state and local laws;

    F.   To hear and determine any and all claims arising from the assumption or rejection of executory contracts and to consummate any such assumptions;

    G.   To adjudicate all controversies concerning the classification of any claim or interest.

Thus, because both the Code and the confirmed reorganization plan provide for jurisdiction, I may properly exercise it. See In re BankEast Corp., 132 B.R. 665 (Bankr. D.N.H. 1991) (thoroughly discussing the landscape of post-confirmation retained jurisdiction under the Code in the context of a pre-confirmation challenge to the plan's jurisdiction provisions); see also In re Polar Molecular Corp., 195 B.R. at 555 (observing that plan provisions for post-confirmation jurisdiction "influence" jurisdiction); In re DN Associates, 165 B.R. at 347 (observing that the jurisdictional provisions of the plan and confirmation order are "significant").

## 2.  Corporate Receiverships Under State Law

States exercise extensive powers over the life and death of corporations organized and existing under their laws. The state court corporate receivership, one manifestation of such powers, is a creature of the equity courts' historical jurisdiction as modified or augmented by modern statute. See generally 16 William Meade Fletcher, Fletcher Cyclopedia of the Law of Private Corporations §§ 7664, 7665 (perm. ed. rev. vol. 1989 & Supp. 1997)[hereinafter "Fletcher"]; see also 3 Ralph Ewing Clark, A Treatise on the Law and Practice of Receivers § 700 (3d ed. 1959 & Supp. 1968-69)[hereinafter "Clark"]("The policy of the law of this country does not permit persons to incorporate and thereby withdraw their property from the legal or equitable remedies applicable against the property of individuals."); 3 id. at § 706 (describing

11

statutory extension of courts of equity jurisdiction over corporations in Nineteenth Century). The purposes for which a receiver might be appointed, and the grounds supporting an order for his or her appointment, vary. See 16 Fletcher, supra, §§ 7666, 7708 (grounds for appointment); 1 Clark, supra, §§ 59, 178-79 (equitable and statutory grounds for appointment). In some cases a so-called "special" receiver might be appointed to take charge of a specific asset, as in the case of a receiver who takes charge of mortgaged premises pendente lite at a foreclosing mortgagee's request. See 16 Fletcher, supra, § 7666; 1 Clark, supra, § 21. In others, the receiver may take charge of the corporation entirely, perhaps simply to wind up the business and distribute assets, perhaps to continue its operation as a going concern. See 16 Fletcher, supra, § 7666. In the latter cases, the receiver is most often termed a "general" receiver. See 16 id.; 1 Clark, supra § 22.

A corporation's insolvency (often in conjunction with other circumstances), or its inability or unwillingness to pay a judgment debt, may provide grounds for a general receiver's appointment. See 16 Fletcher, supra, §§ 7718-21 (discussing insolvency and other factors weighing in the appointment decision); 3 Clark, supra, §§ 732-33 (accord). [10] Generally speaking, receivers appointed

---

[10] Under certain conditions, a receiver might be appointed at the behest of a simple contract creditor, without judgment. 3 id. § 733.

12

under such circumstances are conferred extensive authority over the corporation's affairs, see 16 Fletcher, supra, § 7813, assisted by the appointing court's broad equity powers, including the court's ability and willingness to impose a moratorium on actions against the corporation during the receivership's pendency. See 16 id. § 7785; 1 Clark , supra, § 22(c).

Lengthy exposition on these points is unnecessary. Suffice it to say that state courts have long exercised equity jurisdiction to appoint receivers for corporate entities for sundry reasons, including insolvency, mismanagement, and financial distress. See 16 Fletcher, supra, §§ 7708, 7718-21. And from a relatively early date, there has been concern that the exercise of such traditional equity powers might collide with administration of federal bankruptcy laws. See generally Samuel Williston, The Effect of a National Bankruptcy Law upon State Laws, 22 Harv. L. Rev. 547 (1909)[hereinafter "Williston"].[11]

### 3.  Corporate Receiverships in Rhode Island

Rhode Island's business corporations act is a variant of the Model Business Corporations Act.  See  Mod. Bus. Corp. Act § 14.32;

---

[11] Federal courts developed their own receivership practices, particularly with regard to insolvent railroads, during the latter half of the Nineteenth Century.  That practice did serve as a catalyst, and in some ways a model, for the 1898 Act's reorganization provisions. See Charles Jordan Tabb, The History of the Bankruptcy Laws of the United States, 3 Am. Bankr. Inst. L.Rev. 5, 21-23 (1995)[hereinafter "Tabb"]; Douglas Baird & Thomas Jackson, Cases, Problems and Materials on Bankruptcy 959-66 (2d ed. 1990).

R.I. Gen. Laws §§ 7-1.1-90 - 7-1.1-98 (1956)(1992 reenactment). It contains a codification of common law receivership principles, providing that the state superior court may appoint a receiver for a Rhode Island corporation under certain conditions. See §§ 7-1.1-90 - 7-1.1-98; R.I. Super. Ct. R. Civ. P. 66; see generally Tobias M. Lederberg, An Overview of Rhode Island Receiverships: Theory and Practice, R.I. Bar J., Feb. 1977, at 9 [hereinafter "Lederberg"].[20] Those conditions may be asserted by the corporation's shareholders or by its creditor(s). See § 7-1.1-90.  It is with creditor-initiated receiverships that we are here concerned.

Section 7-1.1-90 of the Rhode Island General Laws provides, in pertinent part:

> **Jurisdiction of court to liquidate assets and business of corporation.**  (a) The superior court shall have full power to liquidate the assets and business of a corporation:
>
> ....
>
>    (2)(A) In an action by a creditor:
>
>    (i) When it is established that the corporation is insolvent; or
>    (ii) When it is established that the corporate assets are being misapplied or are in danger of being wasted or lost.
>
>    (B)  If it is established that the claim of a creditor has been reduced to judgment and an execution

---

[20]    The court rule anticipates that receivers may be appointed for partnerships as well as for corporations, see R.I. Super. Ct. R. Civ. P. 66(h), and such is the case in practice. See Manchester v. Manchester Point Trap Co., 181 A.2d 235 (R.I. 1962); see also Lederberg, supra, at 32 n.3.

thereon returned unsatisfied or that a corporation has
admitted in writing that the claim of a creditor is due
and owing, the establishment of the facts shall be prima
facie evidence of insolvency.

(C) Every petition filed by a creditor for the
liquidation of the assets and business of a corporation
shall contain a statement as to whether the creditor is
or is not an officer, director, or shareholder of the
corporation. Every petition for the liquidation of the
assets and business of a corporation filed by an officer,
director, or shareholder of a corporation, or by a
creditor who is an officer, director, or shareholder,
shall contain (to the best of petitioner's knowledge,
information, and belief) the names and addresses of all
known creditors of any class of the corporation.

§ 7-1.1-90(a).[21]

The Rhode Island court exercises broad equity powers in

---

[21]    Section 7-1.1-90 provides that the superior court may
appoint a liquidating receiver when a shareholder demonstrates
that "dissolution would be beneficial to the shareholders"
because the corporation's directors are deadlocked and the
shareholders cannot break the deadlock, see § 7-1.1-90 (a)(1)(A);
because the corporation's directors or controlling persons are
acting illegally, oppressively or fraudulently, see § 7-1.1-90
(a)(1)(B); because the shareholders are "deadlocked in voting
power" and, for a term including at least two successive
scheduled annual meeting, are unable to elect successors to
directors whose terms have expired, see § 7-1.1-90(a)(1)(C);
because of the misapplication and potential wasting of corporate
assets, see § 7-1.1-90 (a)(1)(D); because of threatened serious
harm to corporate business affairs due to dissension between or
among shareholder factions, see § 7-1.1-90 (a)(1)(E); or because
one-half or more of the corporation's outstanding stock holders
have voted for corporate dissolution. See § 7-1.1-90 (a)(1)(F)).

The statute also provides that the superior court may
appoint a liquidating receiver at the behest of a corporation
that has applied to have its liquidation go forward under court
supervision, see § 7-1.1-90(a)(3), and when the attorney general
files an action to dissolve the corporation and it is shown that
liquidation should precede formal dissolution. See § 7-1.1-90
(a)(4).

appointing and supervising general, liquidating receivers.[22]   The appointing court is vested with "exclusive jurisdiction of the corporation and its property, wherever situated, and of all questions . . . concerning the same." § 7-1.1-91(f).  In practice, when the receiver is appointed the court often will simultaneously issue an injunction prohibiting creditors from pursuing actions against the entity in receivership without obtaining the receivership court's leave. See Lederberg, supra, at 9 -10. Receivers may be appointed for a Rhode Island corporations, and for a "foreign corporation, to the extent the foreign corporation has assets within the state . . . ." § 7.1-1.97.1; see Bess Eaton Donut Flour Co., Inc., No. 96-322, 1998 WL 12198, at *2 (trial

---

[22]     The court's powers encompass the ability to enter orders, both interim, see § 7-1.1-91(a) ("[T]he court shall have general equity jurisdiction and power to issue such orders, injunctions, and decrees as justice and equity may require, to appoint a receiver or receivers pendente lite, with such powers and duties as the court, from time to time, may direct, and to take such other proceedings as may be requisite to preserve the corporate assets wherever situated, and carry on the business of the corporation until a full hearing can be had."), and final. See § 7-1.1-91(b)(after notice and hearing the court may appoint a liquidating receiver or receivers "with authority to take charge of any of the corporation's estate and effects of which he or she has been appointed receiver and to collect the assets of the corporation, including all amounts owing to the corporation whether by shareholders on account of any unpaid portion of the consideration for the issuance of shares or otherwise.").  Rhode Island law vests the court with broad discretion to determine whether a receiver should be appointed.  The court may, in "extraordinary situations," appoint a nonliquidating receiver for an ongoing, solvent corporation, "when no other relief appears to be adequate," and if the appointment will protect interested parties. Levine v. Bess Eaton Donut Flour Co., Inc. No.96-322, 1998 WL 12198, at *3 (R.I. Jan 15, 1998).

court had power to appoint receiver for Rhode Island assets of Connecticut corporation).

Receivers must provide a "such bond as the court may direct with such sureties as the court may require." § 7-1.1-92. Once appointed, (subject to the appointing court's control) the receiver exercises substantial authority over all corporate affairs. See § 7-1.1-91(d).[23]  Assets held by a receiver at the court's direction, including assets that are not part of the so-called "receivership estate," are in custodia legis until the receiver disposes of them pursuant to court order. See Manchester, 181 A.2d at 238 (unsuccessful bidder's deposit, which was required to be returned to it, was not subject to attachment by bidder's creditor so long as the deposit remained in the receiver's possession).

In the usual case, the receiver sells the corporation's assets, either separately or en masse, often as a going concern. See Lederberg, supra, at 11.[24]  The appointing court is empowered

---

[23]    The statute requires that the order appointing the receiver set forth the receivers powers and duties, but provides that those powers and duties may be "increased or diminished at any time during the proceeding." § 7-1.1-91(d).  The receiver's authority may include the power to sue and defend, or to intervene in, actions affecting the corporation; to compromise disputes; to preserve the corporation's assets and to conduct its business; to sell assets (by public or private sale and, at least with the consent of the lienholders, free and clear of liens); and to do "all other acts which might be done by the corporation or that may be necessary for the administration of his or her trust according to the course of equity."  Id.

[24]    See also R.I. Super. Ct. R. Civ. P. 66(h)(requiring express prayer for order authorizing receiver to continue

to authorize payment of compensation for the "receiver or receivers
and to attorneys in the proceeding, and to direct the payment
thereof out of the assets of the corporation or the proceeds of any
sale or disposition of the [corporation's] assets."   § 7-1.1-91
(e); see R.I. Super. Ct. R. Civ. P. 66(I); see also South County
Sand & Gravel Co. v. Bituminous Pavers Co., 274 A.2d 427, 430 (R.I.
1971)(disallowing substantial fees and discussing conditions under
which secured creditors may be surcharged for receivership
administrative expenses).

The Rhode Island receivership court may further administer the
corporation's assets by requiring creditors who wish to receive a
distribution from the receivership estate to file sworn proofs of
claims and by fixing a claims bar date. See § 7-1.1-93.  Creditors
filing untimely, or no, claims may be barred from "participating in
the distribution of the assets of the corporation[,]" but their
claims against the corporation are neither discharged nor otherwise
nullified. Id.[25]

---

business operations, notice to creditors, and court order).

[25]    Section 7.1-1.93 provides:

 **Filing of claims in liquidation proceedings.**  In
proceedings to liquidate the assets and business of a
corporation, the court may require all creditors of the
corporation to file with the receiver, in such form as
the court may prescribe, proofs under oath of their
respective claims.  If the court requires the filing of
claims it shall fix a date, which shall be not less
than four (4) months from the date of the order, as the
last day for the filing of claims, and shall prescribe

A receiver's distribution honors the interests of creditors whose claims encumber corporate assets, but the receivership statute does not set distributional priorities among unsecured creditors. See United States v. Federal Deposit Ins. Corp., 899 F.Supp. 50, 54 (D.R.I. 1995)(citing Leonard Levin Co. v. Star Jewelry Co., 175 A. 651, 653 (R.I. 1934)).   In the event that a creditor or shareholder entitled to a distribution cannot be found, its share, in cash, must be deposited in the general treasury and paid over to it or its representative upon proof of entitlement. See § 7.1-1.97.

Upon completion of liquidation and distribution, the state court enters a decree dissolving the corporation, "whereupon the existence of the corporation shall cease." § 7-1.1-95.[26]   Although

---

the notice that shall be given to creditors and claimants of the date so fixed.  Prior to the date so fixed, the court may extend the time for the filing of claims.  Creditors and claimants failing to file proofs of claim on or before the date so fixed may be barred, by order of court, from participating in the distribution of the assets of the corporation.

§ 7.1-1.93.  See also R.I. Super. Ct. R. Civ. P. 66(f)(addressing claims filing, receiver's report recommending allowance or disallowance, and procedure for resolving claims disputes).

[26]    Section 7-1.1-95 provides:

**Decree of involuntary dissolution.**  In proceedings to liquidate the assets and business of a corporation, when the costs and expenses of the proceedings and all debts, obligations, and liabilities of the corporation shall have been paid and discharged and all its remaining property and assets distributed to its shareholders, or in case its property and assets are

the statute provides that claims against a corporation "survive"
for two years after its dissolution, the survival provision only
operates if dissolution is effected by a court decree <u>without</u> court
supervised liquidation of the corporation's assets and business.
<u>See</u> § 7-1.1-98. Nevertheless, any corporation dissolved "in any
manner" under the statutory procedures enacted in §§ 7-1.1-90
through 7-1.1-98 shall "continue ... for two (2) years after the
date of the dissolution" for the purpose of "enabling it to settle
and close its affairs, to dispose of and convey its property, to
discharge its liabilities, and to distribute its assets ." § 7-
1.1-98.1.[27]

## 4.  General Preemption Principles

As the First Circuit recently observed:

> Article VI of the United States Constitution
> provides that the laws of the United States "shall be the
> supreme Law of the Land," notwithstanding contrary state
> laws.  U.S. Const., art. VI, § 2.  It is settled,
> therefore, "that all conflicting state provisions be
> without effect." <u>Maryland v. Louisiana</u>, 451 U.S. 725,
> 746, 101 S.Ct. 2114, 2129, 68 L.Ed.2d 576 (1981).  When
> faced with a preemption question, however, consideration
> "starts with the assumption that the historic powers of

_____

not sufficient to satisfy and discharge the costs,
expenses, debts, and obligations, all the property and
assets have been applied so far as they will go to
their payment, the court shall enter a decree
dissolving the corporation, whereupon the existence of
the corporation shall cease.

[27]   The applicability of this provision in cases where a
complete liquidation of assets and distribution to creditors is a
prerequisite to issuance of the dissolution decree, <u>see</u> § 7-1.1-
95, is unclear.

the States [are] not to be superseded by ... Federal Acts
unless that [is] the clear and manifest purpose of
Congress." Rice v. Santa Fe Elevator Corp., 331 U.S.
218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947).

Rini v. United Van Lines, Inc., 104 F.3d 502, 504 (1st Cir. 1997).

See also Securities Indus. Ass'n v. Connolly, 883 F.2d 1114, 1117-
18 (1st Cir. 1989).

In Pedraza v. Shell Oil Co., 942 F.2d 48 (1st Cir. 1991), the
court of appeals explained carefully the general framework for
preemption analysis:

> Preemption "always boils down to a matter of
> congressional intent." Connolly, 883 F.2d at 11[17].
> See also Louisiana Public Service Comm'n v. FCC, 476 U.S.
> 355, 369, 106 S.Ct. 1890, 1899, 90 L.Ed.2d 369
> (1986)("The critical question in any preemption analysis
> is always whether Congress intended that federal
> regulation supersede state law."); Metropolitan Life Ins.
> Co. v. Massachusetts, 471 U.S. 724, 747, 105 S.Ct. 2380,
> 2393, 85 L.Ed.2d 728 (1985)("in any pre-emption analysis,
> '[t]he purpose of Congress is the ultimate
> touchstone.'")(citations omitted); Associated Industries
> of Massachusetts v. Snow, 898 F.2d 274, 278 (1st Cir.
> 1990)(same). The task of interpretation is simplified,
> substantially, of course, whenever "Congress has made its
> intent known through explicit statutory language."
> English v. General Electric Co., [496] U.S. [72], 110
> S.Ct. 2270, 2275, 110 L.Ed.2d 65 (1990).

> Absent express preemption, the challenged state law
> must yield when it

>> regulates conduct in a field that Congress
>> intended the Federal Government to occupy
>> exclusively. Such an intent may be inferred
>> from a 'scheme of federal regulation . . . so
>> pervasive as to make reasonable the inference
>> that Congress left no room for the States to
>> supplement it,' or where an Act of Congress
>> 'touch[es] a field in which the federal
>> interest is so dominant that the federal
>> system will be assumed to preclude enforcement

21

of state laws on the same subject.'

> English, 110 S.Ct. at 2275 (citations omitted). Finally,
> preemption will be inferred where the state law "actually
> conflicts with the federal law." Id. Such a conflict
> arises where it is physically impossible to comply with
> both the federal and the state law or where "state law
> 'stands as an obstacle to the accomplishment and
> execution of the full purposes and objectives of
> Congress.'" Id. (citation omitted). See also
> International Paper Co., 479 U.S. at 491-92, 107 S.Ct. At
> 811; Louisiana Public Service Comm'n, 476 U.S. at 368-
> 369, 106 S.Ct. at 1898-99; Hillsborough County, 471 U.S.
> at 713, 105 S.Ct. at 2375.

942 F.2d at 51; see also Ellenwood v. Exxon Shipping Co., 984 F.2d

1270, 1273-74 (1st Cir. 1993).

## 5. Bankruptcy and Preemption.

The Constitution vests Congress with the power to enact

"uniform Laws on the subject of Bankruptcies." U.S. Const. art. I,

§ 8, cl. 4. For much of our nation's early history, Congress

exercised that power only sporadically, often in reaction to

occasional national economic crises. See Tabb, supra, at 12-23;

Williston, supra, at 547.   In periods when no national legislation

was in force, states retained "full power to pass bankruptcy laws."

Williston, supra, at 547.[28]   However, the existence of federal

---

[28]   The Court explained this proposition in Sturges v.
Crowninshield, 17 U.S. 122 (1819):

> If, in the opinion of [C]ongress, uniform laws
> concerning bankruptcies ought not to be established, it
> does not follow, that partial laws may not exist, or
> that state legislation on the subject must cease.   It
> is not the mere existence of the [federal] power, but
> its exercise, which is incompatible with the exercise
> of the same power by the states.   It is not the right

bankruptcy legislation suspends the operation of state bankruptcy laws. See International Shoe Co. v. Pinkus, 278 U.S. 261, 265 (1929)(with passage of 1898 Bankruptcy Act, "[i]n respect of bankruptcies, the intention of Congress is plain.  The national purpose to establish uniformity necessarily excludes state regulation . . . . States may not pass or enforce laws to interfere with or complement the Bankruptcy Act or to provide additional or auxiliary regulations."); see also Stellwagon v. Clum, 245 U.S. 605, 615-16 (1918); Sturges, 17 U.S. at 196.  Of course, whether a state law operates within the field of "bankruptcy" so as to be suspended by a federal statute intended to effect uniform bankruptcy legislation is the essence of the preemption inquiry.[29]

Since passage of the Bankruptcy Act of 1898, federal

_____

to establish these uniform laws, but their actual establishment, which is inconsistent with the partial acts of the states.

Id. at 196.

[29]   Early discussions considered distinctions between "insolvency" laws and "bankruptcy" laws as they related to the English antecedents to which our Constitution's framers referred when drafting the bankruptcy clause.  See Tabb, supra, at 6-12; Williston, supra, at 556.  However, the Supreme Court early noted that because the line separating bankruptcy laws (generally drafted to aid creditors and facilitate commerce) and insolvent laws (generally providing relief for debtors) was not a bright one and because Congress's bankruptcy clause powers might be exercised broadly, there was limited utility in employing the distinction to define permissible state and federal activities in the bankruptcy arena.  See Sturges, 17 U.S. at 195-96 ; see also Stellwagon, 245 U.S. at 615-16 (observing that there is much discussion about the distinction, then using terms "bankruptcy law" and "insolvency law" interchangeably).

23

legislation has "occupied the field" of bankruptcy legislation, superseding (and suspending) all state statutes that trespass on that turf. Tabb, _supra_, at 48; _see_ _International Shoe Co._, 278 U.S. at 264.  Thus it is said  modernly that:

> In the bankruptcy context, there are two basic types of preemption issues.  The first issue is the more global question of whether a state insolvency law is a "bankruptcy" law and thus generally preempted by Congress's exercise of its power under the Bankruptcy Clause.  The second issue concerns whether a particular state statute conflicts with some specific aspect of the federal bankruptcy law.

Tabb, _supra_,  at 47-48.

This case demands the global inquiry.  It is the U.S. Trustee's view that the Rhode Island's receivership proceedings initiated against Newport Offshore and its post-confirmation owners, on account of their insolvency, are of no effect because, when all is said and done, they impermissibly invade the field exclusively (and expansively) occupied by the Bankruptcy Code.[30] To analyze the force of the argument it is necessary to consider the boundaries of the field staked out for federal bankruptcy.  The Supreme Court has provided some guidance to assist the inquiry in a quartet of post-1898 cases.  They and their progeny, taken together with the Bankruptcy Code's express provisions, provide the

---

[30]    The U.S. Trustee's argument refers to specific provisions and practices within Rhode Island's corporate receivership scheme as evidence that it encroaches upon federal bankruptcy territory, but its position is that the entirety of the state scheme is suspended by the Code's preemptive force.

pins from which I may begin to trace the metes and bounds of the
federally-preempted field.

In Stellwagon v. Clum, the Supreme Court considered whether an
Ohio statute authorizing avoidance of fraudulent transfers and
appointment of a receiver to administer assets so recovered for the
benefit of all creditors could permissibly operate notwithstanding
"uniform" federal legislation.   The Court held that the state
statutes were not suspended by the Bankruptcy Act, embracing the
principle of "geographical uniformity" first articulated in Hanover
Nat'l Bank v. Moyses, 186 U.S. 181, 188 (1902).   It noted that,
under the 1898 Act, such state receivership proceedings would be
displaced if the receivership had commenced within four months of
the bankruptcy's initiation and that the bankruptcy trustee himself
could employ state law principles to avoid fraudulent transfers.
See id. at 613-615 (citing Bankruptcy Act §§ 60b, 67e).   In
explaining the preemptive impact of federal bankruptcy legislation,
the Stellwagon Court observed:

> This state statute is not opposed to the policy of the
> bankruptcy law or in contravention of the rules and
> principles established by it with a view to the fair
> distribution of the assets of the insolvent.  It is only
> state laws which conflict with the bankruptcy laws of
> Congress that are suspended; those which are in aid of
> the Bankruptcy Act can stand.
>
>     . . . .
>
> It is settled that a state may not pass an insolvency law
> which provides for a discharge of the debtor from his
> obligations, which shall have the effect of a bankruptcy
> discharge as to creditors in other states, and this

25

> although no general bankruptcy act is in effect.   And
> while it is not necessary to decide that there may not be
> state insolvent laws which are suspended although not
> providing for a discharge of indebtedness, all the cases
> lay stress upon the fact that one of the principal
> requisites of a true bankruptcy law is for the benefit of
> the debtor in that it discharges his future acquired
> property from the obligation of existing debts.

245 U.S. at 615-616 (citations omitted).

In International Shoe Co. v. Pinkus, 278 U.S. 261 (1929), the
Supreme Court concluded that an Arkansas statute, which provided
that insolvent debtors could petition the state court for
appointment of a receiver who would collect and liquidate nonexempt
assets and distribute the proceeds pro rata among creditors, was
preempted by the Bankruptcy Act.   The Arkansas scheme classified
creditors and gave "preference to those fully discharging the
debtor in consideration of pro rata distribution ."   278 U.S. at
264.   The debtor, although eligible to file a voluntary bankruptcy
petition, was not eligible for a bankruptcy discharge because he
had received such a discharge within the six years preceding his
state court filing.   The state procedure was held to be at odds
with the federal act because the debtor "could not have obtained
discharge under Bankruptcy Act . . . and, in proceedings under that
act, all his creditors would have been entitled to participate in
distribution without releasing [him] as to unpaid balances."   278
U.S. at 264-265.

The International Shoe Co. holding was accompanied by broad
dictum addressing the scope of federal bankruptcy preemption:

26

The power of Congress to establish uniform laws on
the subject of bankruptcies throughout the United States
is unrestricted and paramount.   Constitution, art. 1,
§ 8, cl. 4. The purpose to exclude state action for the
discharge of insolvent debtors may be manifested without
specific declaration to that end; that which is clearly
implied is of equal force as that which is expressed. The
general rule is that an intention wholly to exclude state
action will not be implied unless, when fairly
interpreted, an act of Congress is plainly in conflict
with state regulation of the same subject.   In respect of
bankruptcies the intention of Congress is plain.   The
national purpose to establish uniformity necessarily
excludes state regulation.   It is apparent, without
comparison in detail of the provisions of the Bankruptcy
Act with those of the Arkansas statute, that intolerable
inconsistencies and confusion would result if that
insolvency law be given effect while the national act is
in force.   Congress did not intend to give insolvent
debtors seeking discharge, or their creditors seeking to
collect claims, choice between the relief provided by the
Bankruptcy Act and that specified in state insolvency
laws.   States may not pass or enforce laws to interfere
with or complement the Bankruptcy Act or to provide
additional or auxiliary regulations.

278 U.S. at 265 (citations omitted).   Thus, International Shoe Co.

proclaimed federal bankruptcy legislation's preemptive effects

expansively insofar as state procedures providing discharges for

insolvent debtors were concerned.[31]   And even though nothing

prevented the debtor's creditors from petitioning him into

bankruptcy involuntarily (bringing all of the receivership assets

---

[31]   The Court distinguished the Arkansas procedure from a
straightforward assignment for the benefit of creditors, under
which the assignee obtains title to a debtor's assets, liquidates
them and distributes equally among creditors without conditioning
distributions on the creditor's agreement to release the debtor's
unpaid liability.   See 278 U.S. at 267-68;   see also Boese v.
King, 108 U.S. 379 (1883)(addressing a New Jersey assignment
statute).

27

into the bankruptcy estate if done promptly and preventing any discharge), see 278 U.S. at 264, that possibility was not enough to save the Arkansas receivership procedures.[32]

Straton v. New, 283 U.S. 318 (1931), addressed the Bankruptcy Act's relationship to a state lien enforcement procedure. In Straton, a judgment lien creditor initiated an action in West Virginia state court to sell property subject to his lien, joining all parties holding liens and mortgages on the affected property. The state court appointed commissioners to sell the property and distribute the proceeds among lienholders. See 283 U.S. at 319-320. Subsequently, the debtor filed bankruptcy and sought to have the district court enjoin the state court commissioners' sale so that the property could be administered with the debtor's other assets. See 283 U.S. at 320. Answering a question certified to it by the court of appeals, the Supreme Court determined that the West Virginia procedure operated only to enforce the creditor's lien (which, being more than four months old was not avoidable under the Act). See 283 U.S. at 327, 329-30. The Court declined to hold that the bankruptcy filing wrested jurisdiction over the debtor's property from the state court. See 283 U.S. at 329-330.[33]

---

[32]   The Supreme Court noted that the appellant, whose claim against the debtor amounted to $500.00, was incapable of initiating alone an involuntary bankruptcy case. See 278 U.S. at 267.

[33]   The Court's holding, which permitted the state court commissioners' sale to proceed was based on the then-accepted

In reaching its conclusion, the Court in <u>Straton</u> was careful to distinguish the role of the state court commissioners from that of a receiver charged with effecting "a general disposition and distribution of the debtor's property ." 283 U.S. at 327.   The Court adverted to the "well settled principle that a general winding up receivership is tantamount to an insolvency proceeding which will be superseded by bankruptcy." 283 U.S. at 331.[34]

---

principle that:

> [W]here a judgment which constitutes a lien on the debtor's real estate is recovered more than four months prior to the filing of the petition, the bankruptcy court is without jurisdiction to enjoin the prosecution of the creditor's action, instituted prior to the filing of a petition in bankruptcy, to bring about a judicial sale of the real estate.

283 U.S. at 326.

[34]   The Court was adverting to <u>In re Watts</u>, 190 U.S. 1 (1903).   <u>Watts</u> examined a tug-of-war between an Indiana state court receiver and a subsequently-appointed receiver in bankruptcy for control over a debtor corporation's assets.   In resolving questions relating to the propriety of contempt sanctions imposed for noncompliance with conflicting orders of the state and federal courts, the Supreme Court commented:

> We do not understand it to be contended that the passage of the bankruptcy act in itself suspended the statute of Indiana in relation to the appointment of receivers, but only that when the proceedings for such appointment took the form, as they did here, of winding up the affairs of the insolvent corporation, the proceedings in bankruptcy displaced those in the state court and terminated the jurisdiction of the latter.

109 U.S. at 31-32.

The last case in the quartet, Pobrelso v. Joseph M. Boyd Co.,
287 U.S. 518 (1933), considered whether the Bankruptcy Act
suspended operation of Wisconsin's statutory assignment for the
benefit of creditors procedures. Unlike the state insolvency law
that the Court considered in International Shoe Co., the procedures
at issue in Pobreslo did not require creditors to release their
claims as a condition of receiving a share of the liquidation
proceeds distributed by the assignee. Thus, the Court determined
that Wisconsin's law was not suspended by passage of the Bankruptcy
Act because, "[in] view of the construction . . . put upon [the
statute] by the state supreme court, it is evident that the
assignment did not have the effect of instituting proceedings
contemplating discharge of [sic] assignor from its debts." 287
U.S. at 523.[35]

---

[35]   The Court noted that:

A proceeding under the Arkansas law derives its force
solely from legislation that involves a judicial
winding up of an insolvent estate and the discharge of
the debtor. Such a law is within the field of the
federal Act. . . . On the other hand the Wisconsin law
merely governs the administration of trusts created by
deeds like that in question, which do not differ
substantially from those arising under common law
assignments for the benefit of creditors. The
substantive rights under such assignments depend upon
contract; the legislation merely governs the execution
of the trusts on which the property is conveyed. And
as proceedings under any such assignment may be
terminated upon petition of creditors filed within the
time and in the manner prescribed by the federal Act it
is apparent that Congress intended that such voluntary
assignments, unless so put aside, should be regarded as

The foregoing cases disclose the pertinent core bankruptcy preemption principles. State laws that operate to effect, or to coerce from creditors, the insolvent debtor's discharge or release from indebtedness are preempted. Those that operate to distribute an insolvent's estate, without effecting a discharge, are not. Compare International Shoe Co., 278 U.S. 261, with Pobrelso, 287 U.S. 518, and In re Mader's Store for Men, 254 N.W.2d 171 (Wis. 1977).[36] Receivership or similar liquidation processes, available against (or invoked by) insolvent debtors are plainly preempted if they refuse to yield to, or interfere with, federal bankruptcy proceedings, but if they may be administered in harmony with the federal bankruptcy laws, they are not. Compare In re Watts, 190 U.S. 1, with Straton, 283 U.S. 318, and Pobrelso, 287 U.S. 518.

Beyond the core, bankruptcy preemption's reach becomes less clear. Courts are sometimes given to describing the operative

---

not inconsistent with the purposes of the federal Act.

287 U.S. at 526 (citations omitted).

[36]    Another pair of cases provides an instructive comparison. In Moody v. Port Clyde Dev. Co., 102 Me. 365 (1907), the Maine Supreme Judicial Court determined that a state receivership statute was suspended by operation of the Bankruptcy Act. See id. at 384. The statute at issue provided, inter alia, that claims not timely submitted to the receiver were thereafter barred and that attachments secured within thirty days of the filing of the action seeking the receiver's appointment were dissolved. In Carter, Carter and Meigs Co. v. The Steward Drug Co., 115 Me. 289 (Me. 1916), the court held that 1907 amendments to the state's receivership statute, eliminating the law's claims barring provisions, operated to cure the statute's preemption problem and revitalize it. See id. at 294.

principles expansively, even when the case-specific factors triggering preemption might be more narrowly defined. See, e.g., In re Property Management & Invs., Inc., 17 B.R. 728, 730-31 (Bankr. M.D. Fla. 1982).[37] See also International Shoe Co., 278 U.S. at 265.

Bankruptcy preemption's bellwether cases predate the Bankruptcy Code's enactment. Because preemption analysis "always boils down" to assessing congressional intent, Connolly, 883 F.2d at 1117, we cannot apply general principles without focusing closely on the language of the law in question. Doing so, it becomes clear that the Code does not set the parameters of its preemptive effect expressly. But specific Code provisions signal such limits.

For example, 11 U.S.C. § 109(b) lists a variety of entities that are ineligible for Chapter 7 bankruptcy relief, and those disqualifications extend, for the most part, to Chapter 11.

---

[37] In In re Property Management & Invs, Inc., the court held that a state court receiver lacked standing to seek dismissal of a bankruptcy case or to seek an exception to § 543's turnover requirements. Notwithstanding that narrow holding, the court stated: "It is well established that the liquidation of the assets of an insolvency not in a bankruptcy forum is not permissible and federal law will supersede any provisions and any State Court proceedings." In re Property Management & Invs, Inc., 17 B.R. at 731. To the extent the quoted passage states that federal proceedings will supersede a previously-initiated state court proceeding, it is accurate. To the extent it implies that in no event may an insolvent entity's assets be distributed under the auspices of state court proceedings, it is overstatement. See Pobrelso, 287 U.S. at 526.

32

§§ 109(b), (d). Absent other controlling federal legislation, the liquidation or reorganization of such entities is properly state law's concern.   See 2 Lawrence P. King Collier on Bankruptcy ¶ 109.03[3][b](15th ed. Rev. 1997)[hereinafter "Collier"](entities excluded by § 109 are those for which state or other federal law provides regulation over liquidation or reorganization).

Still other provisions provide implicit guidance that some range of state sponsored regulation and oversight for insolvent debtors was anticipated, and accepted, by the Code's drafters.  The Code includes a "receiver . . . appointed in a case or proceeding not under this title" within the definition of "custodian" set forth at § 101(11)(A).  § 101(11)(A).  See In re Gomes, 19 B.R. 9, 10-11(Bankr.  D.R.I.  1982)(state wage earner receiver was "custodian" within Code definition).

Section 543, which addresses the steps that a custodian must take upon the filing of a bankruptcy case's commencement, also provides that the bankruptcy court may "excuse compliance" with its requirements (including requirements for turnover of assets and filing an accounting) "if the interests of creditors and, if the debtor is not insolvent, of equity security holders would be better served by permitting [the] custodian to continue in possession, custody, or control of [the debtor's] property."  § 543(d).

Section 303(h) anticipates that state court receiverships may be conducted for insolvent corporations by making the appointment

33

of a custodian for substantially all of a debtor's property a ground for granting involuntary bankruptcy relief when other prerequisites (e.g., required number of petitioners and sufficient unsecured indebtedness) are satisfied. § 303(h). And § 305 provides that a bankruptcy court may dismiss a bankruptcy case or suspend proceedings within it in appropriate circumstances, which may include the pendency of state court receivership proceedings that appropriately serve the interests of involved parties. See § 305; 2 Collier, supra, ¶ 305.02[2][c] ("when the debtor has been in receivership for so long that the bankruptcy case would be duplicative and wasteful, courts have deferred to state courts and abstained under section 305(a)(1).").

6. **Applying the Principles.**

Taking all this into account, and indulging in the required presumption that state laws are valid, see Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (19470, I conclude that Rhode Island's receivership procedures are not broadly preempted by the Bankruptcy Code's scheme.

As discussed above, the state procedures continue a long history of equity jurisdiction, a history that predates the Bankruptcy Code and its antecedents. Rhode Island receiverships, like state court receiverships generally, were within the contemplation of the Code's drafters, but the Code does not expressly preempt them. Indeed, there are instances in which the

34

Code may encourage deference to such state proceedings.  Compare,
e.g., In re Fax Station, Inc., 118 B.R. 176, 177 (Bankr. D.R.I.
1990)(applying § 305(a) and concluding that, given nature of the
case, state court proceedings were appropriate), with In re Barker-
Chadsey Co., 28 B.R. 308, 310 (Bankr. D.R.I. 1983)(applying
§ 305(a) and concluding that bankruptcy case should proceed).
Given the prerequisites for involuntary bankruptcy relief, there
obviously will exist circumstances where federal relief may be
unavailable but state court relief is.  Other occasions where
federal relief is unavailable will exist as a function of the
Code's limitations upon whom (or what) may be a debtor under its
various chapters.

Although a creditor who fails to file a timely claim, or any
claim, in state receivership proceedings may discover that post-
receivership collection attempts prove an unrewarding exercise,
Rhode Island law does not discharge the debtor's liability or
extinguish the creditor's claim.  In this respect, it differs
little from the state procedure upheld by the Supreme Court in
Pobreslo.

What is more, Newport Offshore's Rhode Island receivership
is not in any way set against the Bankruptcy Code in this
instance.  No one disputes that a state court receivership could
never interfere with interested parties' ability to initiate
bankruptcy proceedings, which would then supercede the

receivership.  Nor could they.  See In re S & S Liquor Mart,

Inc., 52 B.R. 226, 228 (Bankr. D.R.I. 1985)(corporate principals

retain the right to initiate voluntary bankruptcy notwithstanding

receivership); In re Rite-Cap, Inc., 1 B.R. 740, 742 (Bankr.

D.R.I. 1979)(creditor who initiated state court receivership not

barred from joining involuntary bankruptcy petition under the

pre-Code Bankruptcy Act).  In this case, or in any other where

federal bankruptcy relief may be available, the appropriate

parties may seek an order for relief through voluntary or

involuntary petition.

Indeed, were preemption to operate in this case to render

the state court receivership a nullity, the resulting chaos would

not only work to frustrate smooth functioning of procedures aimed

to permit orderly distribution of insolvent estates, it would

operate to enrich the federal treasury by denying creditors their

due.

### Conclusion

In short, I conclude that the Rhode Island receivership

procedures are not preempted as being "tantamount to bankruptcy"

nor because of any conflict with federal law.[38]

The objection is overruled; the disbursing agent's motion is

---

[38]    The U.S. Trustee's argument goes to general preemption
only.  I express no opinion whether any specific aspect of the
Rhode Island procedures would weather different constitutional or
other challenges brought by parties properly invested with
standing.

36

granted.

DATED: _February 9, 1998_                    _____

James B. Haines, Jr.

U.S. Bankruptcy Judge*

*For the District of Maine, sitting by designation.